UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | CR-N-04-30033-MAP |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | |
| ) | |
| **RAYMOND ASSELIN, JR.** ) | |
| ) | |
| **Defendant.** ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT RAYMOND ASSELIN, JR.'S
SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE**

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files this response to defendant Raymond Asselin Jr.'s Sentencing Memorandum and Motion for Downward Departure.[1]

This motion, which seeks a downward departure or guidelines deviation based on a claimed loss that overstates the seriousness of the offense as well as the factors set forth in 18 U.S.C. § 3553(a), should be denied as baseless.

I. Background

    A. Asselin, Jr.'s Offense Conduct

As set forth in far greater detail in the Pre-Sentence Report dated October 26, 2006 (the "PSR"), Asselin, Jr. participated in a

---

[1] The defendant's submission has not been docketed.

1

vast and damaging series of crimes centered around the corrupt operation of the Springfield Housing Authority (the "SHA") by his father, Raymond Asselin, Sr.

In particular, the defendant pleaded guilty to conspiracy to commit bribery (Count 3), in violation of 18 U.S.C. § 370 and 201; conspiracy to commit theft against the government (Count 85), in violation of 18 U.S.C. § 370 and 641; conspiracy to commit mail and wire fraud (Count 86), in violation of 18 U.S.C. §§ 370, 1341, 1343, and 1346; and obstruction of justice (Count 104), in violation of 18 U.S.C. § 1503.

Count 3. In connection with the bribery conspiracy charged in Count 3, the defendant received a wide variety of gratuities, including: a sliding french door for his home; various payments for lumber and materials for his home, including for a new deck, and the labor for the installation of the deck; new windows and the labor to install the new windows for his home; and a stainless steel sink, sewage ejector and hot water heater installed at his business, RayTron, Inc. The defendant is ultimately responsible for approximately $9,463.21 in gratuities. See Indictment, Racketeering Acts 33, 35, 47, 55, 58, and 79.

Notably, this amount understates the seriousness of Asselin's Jr.'s offense, since the Government could not quantify a cost for: (I) the free living room, hallway, and bedroom carpeting received by Asselin, Jr. for his home (Racketeering Act 114); and (ii) free

plumbing fixtures supplied by Springfield Plumbing and William Pappas for two bathroom renovations at Asselin, Jr.'s home.

Count 85. In connection with the defendant's theft charged in Count 85, the defendant is responsible, either through his direct knowledge or reasonable foreseeability, for approximately $66,115.82 in home improvement expenses, automotive repair payments, and other personal expenditures. See Indictment, Count 85 and Racketeering Acts 162-238. The automotive repair scheme required the vendor to create fictitious invoices that expensed work on the personal vehicles as work on SHA vehicles; the estimated loss attributed to Asselin, Jr. (and the other members of the Asselin family) for this particular scheme is $29,736. See Indictment, ¶ 73.

As with Count 3, the loss figure in Count 85 also does not capture a substantial amount of theft attributable to Asselin, Jr., such as the remodeling of his two bathrooms and the painting and wallpapering of the interior of his home by an SHA worker.

Count 86. Beginning in approximately 2000, Asselin, Jr. served as the Treasurer of Christopher Asselin's campaign committee. In this campaign finance mail and wire fraud scheme, Asselin, Jr. assisted Christopher Asselin in his electoral campaigns for the 12th Hampden District by concealing campaign expenses paid by SHA and SHA contractors, illegal cash contributions made by various individuals, and labor performed by SHA employees on SHA time from defendant

Christopher Asselin's political opponents, the voters of the 12th Hampden District and the general public.  PSR, pages 43-47.

Racketeering Acts 27, 48, 54, 64, 75, 92, 133, 216, 218, 219, 221, 231, 234, 235 and Overt Acts 82 and 85 of Count 85 set forth the amount of fraud that can be reasonably be attributable to Asselin, Jr. because of his direct knowledge or reasonable foreseeability.  The amount of fraud specified equals $36,279.86.  This sub-total is increased to an overall total fraud of $40,279.86 by adding the following: $3,000.00 in cash contributions raised by Frank Ware and seized during the September, 2002 search warrant at Christopher Asselin's residence; at least $500.00 in cash contributions from William Pappas; and at least $500.00 in cash contributions from Christopher Asselin's sister in law.

As with Counts 3 and 85, this overall total does not fully capture the seriousness of the offense, since it omits: (i) an unquantifiable amount for labor by SHA employees who built campaign signs, copied campaign literature, stuffed envelopes, and performed other campaign tasks on SHA time; and (ii) the campaign contributions by contractors, such as Gary Baribeau, Nicholas Katsounakis, and others, who felt compelled to contribute due to their business relationship with SHA.

<u>Count 104</u>.

In an attempt to conceal his crimes and obstruct the grand jury investigation, Asselin, Jr. shredded many documents that linked both

4

the receipt of gratuities as well as the theft of SHA materials to his residence. For example, Asselin, Jr. was captured on tape shredding documents, that bore the name of Springfield Plumbing and William Pappas, the SHA administrative office address of 25 Saab Court, and his mother's handwriting. PSR at 50-53 (recounting, e.g., Asselin, Jr.'s statements, "Jim said to go through the house and throw everything away that might be linked," and "Look at this. 25 Saab Court [Sound of shreddder]. That's the kind of shit that they look for right there."); see also PSR at 60, ¶ 277.

Further, in August 2002, Asselin, Jr. brought home a briefcase full of cash and told his wife that his father wanted to hide the briefcase in their house because his father suspected that law enforcement might search his father's house. Asselin, Jr. ultimately secreted the briefcase at his sister's home, where it was seized by the FBI containing approximately $239,000. PSR at 53.

Lastly, Asselin, Jr. counseled his wife to lie to law enforcement about the briefcase: "That ain't shit that you can say, baby. Because you don't know, I don't know. Not to my knowledge. I am unaware of that." Id.

### 1. The Impact On Victims

As set forth above, the actual fraud and loss amounts specified for Counts 3, 85, and 86 understate the seriousness of the offenses because some of the bribery, theft, and fraud could not be calculated with precision. Moreover, dollar figures simply do not

reflect the true harm caused by Asselin, Jr. For example, the harm done to the voters of the 12th Hampden District and the general public as a result of Count 86 is simply immeasurable.

As the SHA Board of Commissioners made clear in its Victim Impact Statement dated November 22, 2006 (the "Impact Statement"), "[m]any have been victimized and it will take a very long time to recover. . . . [t]he victim impacts have been severe." Impact Statement, at 1, 7. As the Impact Statement demonstrates, the loss figure attributed to any one defendant simply cannot capture the full extent of the harm caused by the defendants' crimes. The defendants' crimes "have broken that essential trust with tenants, vendors, federal and state funding sources, and the general public." Id. at 2. Such damage to the public trust is, literally, incalculable.

As one concrete example of this intangible harm, SHA lost its classification as a high-performing agency, which in turn resulted in the loss of essential federal funds. Id. at 3. In order to regain this valuable status and bring the SHA back to even keel, SHA had to devote "[t]housands of hours of time." The Board attests that "[i]t would take a forensic accountant to put a true dollar value on the effort," which cost an estimated "hundreds of thousands of dollars in time and talent." Id. at 3. Moreover, when SHA fails to obtain funding because of its criminal past, "the victims are the

seniors and the disabled individuals who are the intended beneficiary" of the funds.  Id. at 4.

Further, as many of SHA's buildings are "nearing functional obsolescence," the cupidity of the defendants, who received numerous benefits to their private homes, stands in stark relief.  Id. at 5. In sum, as the SHA Board recognized, "the totality of the corruption is jaw-dropping."  Id. at 6-7.

II.  The Probation Department Correctly Calculated Asselin, Jr.'s Advisory Guideline Range

Asselin, Jr. first contends that the loss overstates the seriousness of his offense.  However, as set forth above, the PSR correctly calculated the loss and fraud amounts.  If anything, the PSR's calculations *underestimate* the seriousness of his offenses, since they do not capture all of the tangible benefits obtained by Asselin, Jr. in the schemes, nor do they reflect the intangible harm caused by his corrosive conduct, as illustrated by the SHA Impact Statement.  As a result, Asselin, Jr. merits no re-calculation or downward departure from his Advisory Guidelines Range

Asselin, Jr. also states, without any specific facts to substantiate the claim, that he is entitled to a three-level role reduction rather than a two-level role reduction.  While clearly less culpable than his father and Art Sotirion, Asselin, Jr. nonetheless was an active participant in all of the crimes to which he pleaded guilty. He actively received the gratuities from the SHA contractors and the items stolen from SHA; he served as the

treasurer of Christopher Asselin's re-election campaign; and he not only directed his wife to shred documents and lie to investigators, but also secreted his father's briefcase at his sister's home.

III. <u>Asselin, Jr. Does Not Merit A Section 3553(a) Deviation</u>

Asselin, Jr. concedes, as he must, that he "always knew his father and Art Sotirion controlled the Springfield Housing Authority; he understood the benefits he received for his home and business could not possibly be free; he freely accepted the benefits incurred by being part of the Asselin family; and he cared deeply about his family's activities being uncovered."  Motion, at 5.

However, in a shockingly base attempt to shift responsibility, Asselin, Jr. seeks to blame his own <u>wife</u> for not being sufficiently supportive to permit him the strength to pull away from his family and start his life somewhere new.  Motion, at 5.[2]  To the contrary, his wife (and later, his brother) demonstrated the strength to stand apart from the Asselin family and work with law enforcement to capture the full extent of their crimes.  If anything, Asselin, Jr. has demonstrated that even now, he appears unwilling to accept full responsibility for his crimes.

---

[2]  The Court may recall that the day following his wife's testimony in the trial of Peter Davis, Asselin, Jr. remained in the courtroom during the entire session, in an apparent effort to confront and intimidate his wife.

8

1. <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of the offense warrant a Guidelines sentence. As set forth above, Asselin, Jr. engaged in a broad and corrosive range of bribery, theft, and campaign fraud. Tellingly, when it became apparent that law enforcement was investigating these offenses, he opted for the worst of all possible courses: to obstruct and thwart the investigation by shredding documents, secreting evidence, and counseling his wife to lie.

Given the seriousness of the underlying offenses, and the defendant's central role, the nature and circumstances of the offense require a Guidelines sentence. <u>See</u> 18 U.S.C. § 3553(a)(1).

2. <u>History and Characteristics of the Defendant</u>

Asselin, Jr. concedes that he has had a life of relative privilege and affluence. He attended a prestigious local private school, did well in school, and purchased his home when he was approximately 24 years old. He is a licensed electronics technician who has owned and operated his own business for over ten years. Motion at 4-5; PSR ¶ 325. According to his tax returns, his business earned substantial income for the years 2001-2004, including as much as $433,000 in 2002. PSR at 71. The defendant owns no fewer than six automobiles and three recreational vehicles, and his net worth exceeds $1 million. PSR at 69-70.

Moreover, Asselin, Jr. is in relative good physical and mental health, and has no substantive abuse problems or other extenuating

9

ailments that might have motivated him to commit his crimes. PSR ¶¶ 323-24.

Asselin, Jr.'s personal characteristics weigh in favor of, rather than against, a Guidelines sentence. First, as an educated person of relative affluence, Asselin, Jr. well knew right from wrong. Further, he had no financial need to commit the crime. To the contrary, he has a net worth that is rare among offenders who appear before this Court. Thus, it appears that only his naked arrogance and greed motivated him to commit his crimes. As a result, his personal circumstances aggravate, rather than mitigate, the seriousness of his crimes. At the very least, his history and characteristics warrant a Guidelines sentence. See 18 U.S.C. § 3553(a)(1).

    3.   <u>The Need for the Sentence Imposed</u>

A Guidelines sentence is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Even Asselin, Jr. concedes that "[t]here is a need here to impose some punishment." Motion, at 6.

Here, Asselin, Jr. participated in offenses that ultimately harmed the SHA and its needy tenants, its contractors, and its administrators, as well as Christopher Asselin's political opponents, the voters of the 12th Hampden District, and the general

public, and the law enforcement and grand jury investigation into the crimes.

In this case, where the defendant participated in a series of crimes marked by naked greed and brazen disrespect for law enforcement, only a Guidelines sentence will promote "respect for the law" and "provide just punishment." 18 U.S.C. § 3553(a)(2)(A). Moreover, a Guidelines sentence would provide general deterrence for others similarly situated in society. See 18 U.S.C. § 3553(a)(2)(B).

    4.   The Need to Avoid Unwarranted Sentencing Disparities

Lastly, imposing a Guidelines sentence "presumptively satisfie[s]" the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. United States v. West, No. 03 Cr. 508 (RWS), 2005 WL 180930, *7 (S.D.N.Y. Jan. 27, 2005); see also United States v. Wilson, 350 F.Supp.2d 910, 925 (D. Utah 2005) (stating that because "the Guidelines are the only standard available to all judges around the country today . . . . the Guidelines should be followed in all but the most exceptional cases.").

IV.  Asselin, Jr.'s Firearms

As the PSR indicates, Asselin, Jr. possesses three firearms in his home: a .22 caliber rifle, a Colt revolver, and a semi-automatic handgun. PSR ¶ 321. The government requests that the Court order that by the time of sentencing, the defendant remove these firearms

11

from his possession by either lawfully transferring them to a third-party or surrendering them to the FBI.

V. <u>Conclusion</u>

For the foregoing reasons, the Government respectfully asks that the Court deny any downward departure or deviation from the Advisory Guidelines Range and impose a sentence at the top of the Advisory Guidelines Range.

Filed this 28th day of November, 2006.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney


                              <u>   /s/ Steven H. Breslow        </u>
                              STEVEN H. BRESLOW
                              Assistant United States Attorney

CERTIFICATE OF SERVICE

Hampden, ss.                                Springfield, Massachusetts
                                            November 28, 2006


    I, Steven H. Breslow, Assistant U.S. Attorney, do hereby certify that I have served a copy of the foregoing by electronically filing and mailing said motion to:

Daniel Kelly, Esq.
101 State Street
Suite 715
Springfield, MA  01103
Counsel for defendant Francis G. Keough

Lori Levinson, Esq.
66 West Street
Pittsfield, MA  01201
Counsel for Defendant Angel T. Guzman

Michael Foy, Esq.
935 Main Street, Suite 203
Springfield, MA  01103
Counsel for Defendant Michael P. Hallahan


                                            /s/ Steven H. Breslow
                                        STEVEN H. BRESLOW
                                        Assistant United States Attorney